748 A.2d 625 (2000)
329 N.J. Super. 536
STATE of New Jersey, Plaintiff-Respondent,
v.
Richard James RHODES, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 2000.
Decided April 10, 2000.
Lon Taylor, Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Taylor, of counsel and on the brief).
Kristen A. McKearney, Deputy Attorney General, for plaintiff-respondent (John J. Farmer, Jr., Attorney General, attorney; Ms. McKearney, of counsel and on the brief).
Before Judges PRESSLER, KIMMELMAN and CIANCIA.
The opinion of the court was delivered by KIMMELMAN, J.A.D.
Defendant Richard James Rhodes was convicted of first-degree armed robbery, N.J.S.A. 2C:15-1a(2); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d; fourth-degree unlawful possession of a weapon under circumstances not manifestly appropriate, N.J.S.A. 2C:39-5d; third-degree theft of a controlled dangerous substance (CDS), N.J.S.A. 2C:20-3a and N.J.S.A. 2C:20-2b(2)(C); and third-degree possession of a CDS, N.J.S.A. 2C:35-10a(1).
On the first-degree armed robbery conviction, defendant was sentenced to a term of life imprisonment without parole under the Persistent Offender Accountability Act, N.J.S.A. 2C:43-7.1a. This act is generally referred to as the Three-Strikes Law and provides for a life sentence without parole for any person convicted on three separate occasions of certain violent *626 crimes. The sentences for the remaining third-degree convictions were for five years in prison each with a two and one-half year period of parole ineligibility, concurrent with each other and concurrent to the sentence of life imprisonment. The sentence on the fourth-degree offense was for a concurrent term of eighteen months.
Defendant seeks a reversal of his convictions or, alternatively, the modification of his sentence on the following grounds set forth in his brief:
POINT IDEFENDANT'S CUSTODIAL ADMISSION SHOULD HAVE BEEN SUPPRESSED SINCE THE POLICE FAILED TO SCRUPULOUSLY HONOR DEFENDANT'S INVOCATION OF HIS RIGHT TO REMAIN SILENT AND REQUEST FOR COUNSEL.
The Miranda Hearing.
Miranda and the Per Se Edwards Rule.
POINT IITHE COURT'S SUGGESTION TO THE JURY THAT DEFENDANT INTENDED TO PURPOSELY DEPRIVE THE OWNER OF THE PERCOCET WAS A DIRECTED VERDICT THAT IMPROPERLY INTRUDED ON THE FUNCTION OF THE JURY AND DIMINISHED DEFENDANT'S PRESUMPTION OF INNOCENCE. (Not Raised Below).
POINT IIITHE COURT SHOULD HAVE GRANTED DEFENDANT'S MOTION TO RECUSE THE TRIAL PROSECUTOR WHO PREVIOUSLY REPRESENTED THE SAME PERSON THAT WAS IDENTIFIED AS THE PERPETRATOR; DEFENSE COUNSEL WOULD HAVE BEEN ALLOWED TO CALL THE PROSECUTOR AS A WITNESS TO SHOW BIASTHAT THE PROSECUTOR FAILED TO INVESTIGATE THAT INDIVIDUAL BECAUSE HE PREVIOUSLY REPRESENTED HIM IN PRIVATE PRACTICE.
POINT IVTHE PROSECUTOR'S COMMENTS DURING SUMMATIONPERSONALLY VOUCHING FOR THE STATE'S CASE, ALLUDING TO MATTERS OUTSIDE OF THE EVIDENCE AND ALLUDING TO DEFENDANT'S FAILURE TO TESTIFYWERE IMPROPER.
(Partially Raised below).
POINT VDEFENDANT'S SENTENCE OF A LIFE TERM OF IMPRISONMENT WITH NO PAROLE UNDER THE "THREE STRIKES" STATUTE WAS ILLEGAL.
We have carefully considered these contentions and all supporting arguments advanced by defendant. We reverse the defendant's convictions based on our judgment that his Miranda[1] rights were not scrupulously honored. Furthermore, apart from the Miranda violation, we are convinced that defendant was not subject to a sentence of life imprisonment without parole under the Three-Strikes Law.
By way of factual background, on the evening of October 27, 1995, a clerk at a local pharmacy in Raritan Township had opened the establishment's rear door to take out some garbage. As she returned, she heard a noise and saw a man standing behind her. The man produced a knife and ordered her back into the store. She was then ordered to stand with two other clerks and the man demanded drug compounds known as Percodan and Percocet. A paper bag was filled with the products and the man took some cash from the register. After the man fled the store, one of the employees called "911" and reported the robbery.
Detectives identified a car that was observed speeding from the direction of the scene as belonging to the wife of defendant. The victims, who gave descriptions of the robber, were unable to positively identify defendant from a photo array. The next day, a twelve-inch knife was found on the ground not far from the *627 pharmacy. At approximately 1:00 a.m. on October 29, 1995, a warrant to search the defendant and the car was executed. However, the results thereof proved unproductive.

I
At 3:30 a.m. on October 29, 1995, defendant and his wife were asked to come to police headquarters for questioning. They voluntarily complied. They were questioned in separate rooms. Defendant was given his Miranda warnings and he chose not to answer any questions without counsel being present. Defendant was placed under arrest at about 6:10 a.m.
At about 10:00 a.m., Detective Mark Taggart began observing defendant. He was aware that defendant "was not talking." Taggart knew defendant from an earlier occasion in September 1994, when Taggart had notified defendant and his wife about the death of defendant's step-daughter in North Carolina. About a month before the robbery, Taggart had assisted defendant in gaining more information about the step-daughter's death. Taggart knew that defendant, who had confided in him at that time, had gone back to using drugs. On the morning in question, October 29, 1995, Taggart admitted to speaking with defendant for about thirty minutes about his drug problem "among other things."
At about 10:30 that morning, defendant's wife was transported to her home so that she could obtain her medication. She was returned to headquarters and defendant, who had requested all morning to talk with her, was permitted to speak with her at about 11:50 a.m. After they had finished their chat, defendant told Taggart that he wanted to talk. Taggart informed a lieutenant from the Prosecutor's Office that defendant had changed his mind and wished to speak because he learned that his wife had confessed. He did not want her to be blamed for the robbery which was solely his idea.
Defendant was See-Mirandized and, at approximately 12:50 p.m., he gave a taped confession. The description he gave of the knife used in the robbery was consistent with the knife found on the nearby road.
Prior to trial, defendant moved to suppress his taped confession based on his claim that his Miranda rights were not scrupulously honored. Defendant claimed that Taggart improperly initiated a conversation with him after his assertion of his right to remain silent and after he had requested counsel. On appeal, defendant relies upon (1) State v. Hartley, 103 N.J. 252, 261, 511 A.2d 80 (1986), which states that the police must scrupulously honor a suspect's assertion of his right to remain silent "independent of the requirement that any waiver be knowing, intelligent and voluntary," and upon (2) Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981), where the United States Supreme Court said:
We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

[(emphasis added)]
A pre-trial hearing was conducted to determine the admissibility of defendant's confession. We disagree with the judge's conclusion that defendant's confession was admissible and note that the judge specifically found that it was Detective Taggart who initiated the custodial conversation with defendant. According to defendant, the conversation initiated by Taggart started with small talk. They talked about defendant's brother, a drug user, who had committed suicide and that defendant and his wife, Patty, needed treatment for their own drug problems. Taggart offered to get help for their drug treatment. From our review of the record it is clear that the *628 conversation initiated by Taggart was not limited to defendant's wife's medical condition but concerned other matters as well.
It is certain that defendant's earlier invoked right to remain silent without counsel being present was not properly respected. The in-custody conversation, which started on a personal basis, regardless of the intention of Taggart, was, to paraphrase the language of Miranda, an inherently compelling pressure to undermine defendant's will to resist and remain silent and to compel him to speak where he would not do so freely. Miranda, supra, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719; see also Hartley, supra, 103 N.J. at 262-63, 511 A.2d 80. As our Supreme Court made clear in Hartley, supra, 103 N.J. at 268, 511 A.2d 80 "a previously-invoked right to silence is not scrupulously honored in the absence of, at the least, fresh Miranda warnings...." Here, the thirty-minute conversation initiated by Detective Taggart subsequent to defendant's earlier invocation of his Miranda rights was not preceded by the administration of "fresh Miranda warnings." Id.
We are satisfied that while Taggart's conversation with defendant was not express questioning or interrogation, it nevertheless was the "functional equivalent" of questioning. See Rhode Island v. Innis, 446 U.S. 291, 299-301, 100 S.Ct. 1682, 1688-90, 64 L.Ed.2d 297, 306-08 (1980).
For these reasons, defendant's confession should have been suppressed.
We assume that defendant may be retried and find it appropriate to express our view concerning the applicability of the Three-Strikes Law to this case.

II
Like the federal government and other jurisdictions, New Jersey has adopted the Persistent Offenders Accountability Act, N.J.S.A. 2C:43-7.1a, generally referred to, by way of shorthand expression, as the "Three-Strikes Law." The law provides for mandatory life imprisonment without parole for third-time criminal offenders of certain violent crimes.
N.J.S.A. 2C:43-7.1a provides:
A person convicted of a crime under any of the following: N.J.S. 2C:11-3; subsection a. of N.J.S. 2C:11-4; a crime of the first degree under N.J.S. 2C:13-1, paragraphs (3) through (6) of subsection a. of N.J.S. 2C:14-2; N.J.S. 2C:15-1; or section 1 of P.L.1993, c.221 (C.2C:15-2), who has on two or more prior and separate occasions been convicted of a crime under any of the foregoing sections or under any similar statute of the United States, this state, or any other state for a crime that is substantially equivalent to a crime under any of the foregoing sections, shall be sentenced to a term of life imprisonment by the court, with no eligibility for parole.
In addition to the present first-degree robbery conviction, defendant had also been convicted of armed robbery in New Jersey on November 2, 1973. The State attempted to use defendant's robbery conviction in Ulster County, New York in 1970 as the "third strike" under N.J.S.A. 2C:43-7.1a. Defendant does not challenge his 1973 New Jersey armed robbery conviction but argues that his 1970 New York robbery conviction, in the words of the statute, was not "substantially equivalent" to the enumerated crime of robbery, N.J.S.A. 2C:15-1, under the Three-Strikes Law.
The 1970 New York conviction was precipitated either by defendant's robbery or alleged participation in a robbery. Defendant was charged with first-degree robbery pursuant to N.Y. Penal Law § 160.15 (McKinney 1999), which defines robbery in the first-degree as a crime in which the actor forcibly steals property while "armed with a deadly weapon." However, defendant was later indicted for second-degree robbery. N.Y. Penal Law § 160.10 (McKinney 1999) defines robbery in the second degree as a crime in which the *629 actor forcibly steals property and "[d]isplays what appears to be a pistol ... or other firearm." Nevertheless, on November 5, 1970, defendant pled guilty to the crime of third-degree robbery. N.Y. Penal Law § 160.05 (McKinney 1999), in contrast to the previous sections, defines robbery in the third-degree as follows: "A person is guilty of robbery in the third degree when he forcibly steals property."
Significantly, § 160.05 of the New York Penal Law defining robbery in the third degree makes no mention of or reference to the use or display of a weapon or the threatening of or infliction of serious bodily injury. On the other hand, the New Jersey offense of first-degree robbery (N.J.S.A. 2C:15-1) which is a constituent offense of the Three-Strikes Law requires the actor to be either armed with or threatening the immediate use of a deadly weapon, or to purposely inflict or attempt to inflict serious bodily injury. Clearly, because of this material difference, third-degree robbery as defined by the New York Penal Law is not substantially equivalent to the New Jersey offense of first-degree robbery. We point out that the Legislature did not intend second-degree robbery to be an offense which is comprehended by the Three-Strikes Law. N.J.S.A. 2C:43-7.1b(1) specifically refers to second-degree robbery as an offense to be considered as one of the constituent crimes necessary for authorizing an extended term for repeat violent offenders. See State v. Oliver, 298 N.J.Super. 538, 564 n. 10, 689 A.2d 876 (Law Div.1996), aff'd on other grounds, 316 N.J.Super. 592, 720 A.2d 1001 (App.Div.1998), aff'd 162 N.J. 580, 745 A.2d 1165 (2000).
The fact that defendant was initially charged with and first indicted for a New York offense which is substantially equivalent to similar offenses under New Jersey law is of no moment. N.J.S.A. 2C:43:7.1a pointedly requires defendant to have been "convicted" of a crime in another jurisdiction that is "substantially equivalent" to one of the New Jersey offenses which are constituent parts of the Three-Strikes Law. No such conviction occurred in New York.[2] The substantial equivalency of crimes committed in other jurisdictions with the enumerated Three-Strikes Law offenses depends upon the statutory elements of the offense for which defendant was actually convicted. See State v. Simon, 161 N.J. 416, 509-10, 737 A.2d 1 (1999). Hence, in light of this distinction, defendant's criminal history did not make him subject to the Three-Strikes Law. It was error for the judge to have sentenced defendant to life imprisonment without parole under that law.
In passing, we note that in his brief submitted to this court, defendant questions the constitutionality of N.J.S.A. 2C:43-7.1a and asserts that the statute "violates his rights of due process of law, equal protection, as well as bans on cruel and unusual punishment and ex post facto laws...." Since the submission of defendant's brief, the New Jersey Supreme Court has decided State v. Oliver, 162 N.J. 580, 745 A.2d 1165 (2000), which rejects each of defendant's arguments.
For the foregoing reasons, defendant's confession is suppressed and his convictions are reversed. In addition to the reversal of defendant's convictions, we note that his sentence to life imprisonment without parole was an improper application of the Three-Strikes Law.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).
[2] In all of the Oliver opinions, the courts refer to prior "convictions" rather than prior charges. See generally State v. Oliver, 298 N.J.Super. 538, 689 A.2d 876 (Law Div.1996), aff'd, State v. Oliver, 316 N.J.Super. 592, 720 A.2d 1001 (App.Div.1998), aff'd, State v. Oliver, 162 N.J. 580, 745 A.2d 1165 (2000).